Donald M. Falk (SBN 150256)
dfalk@schaerr-jaffe.com
SCHAERR | JAFFE LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel.: (415) 562-4942
Fax: (202) 776-0136

Eugene Volokh (SBN 194464)
evolokh@schaerr-jaffe.com
SCHAERR | JAFFE LLP
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Tel.: (310) 206-3926

Gene C. Schaerr*
gschaerr@schaerr-jaffe.com
Edward H. Trent*
etrent@schaerr-jaffe.com
Brian J. Field*
bfield@schaerr-jaffe.com
Justin A. Miller*
jmiller@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Tel.: (202) 787-1060

*Pro hac vice application
forthcoming

Counsel for Plaintiff

1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN SANCHEZ, | ) |
| | ) Case No.: 2:25-cv-489 |
| Plaintiff, | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| UNITED AIRLINES, INC., and | ) |
| ASSOCIATION OF FLIGHT | ) |
| ATTENDANTS-COMMUNICATIONS | ) |
| WORKERS OF AMERICA | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Ruben Sanchez, through undersigned counsel, files this Complaint for damages and equitable relief against Defendants United Airlines, Inc. ("United") and the Association of Flight Attendants–Communications Workers of America ("AFA-CWA" or "Union") (collectively, "Defendants").

## INTRODUCTION

Sanchez had been a loyal United flight attendant for 27 years and 7 months of service. But that career came to an end based on an investigation following an online complaint containing false allegations about comments Sanchez allegedly made on a redeye flight from Los Angeles to Cleveland. The investigation proved the complaint false, but that did not stop United from searching for a reason to terminate Sanchez. And that reason presented itself when the investigation revealed Sanchez's Catholic beliefs on marriage and sexuality, beliefs contrary to United's expressed views on the subjects. With United's culture increasingly hostile to people with traditional religious or conservative political beliefs as well as its older flight attendants, United turned to Sanchez's personal X account to find posts, reposts, and mere "likes" to justify his termination. The content at issue had nothing to do with

COMPLAINT

United and had no effect on Sanchez's exceptional job performance.  Then, when it came to taking his grievance to arbitration, the Union dropped its representation of Sanchez for unreasonable and arbitrary reasons, leaving United's unlawful firing of him to stand.

United and the Union chose to target Sanchez for retaliation and termination based on his age and his religious and political beliefs and statements, all contrary to the Defendants' Collective Bargaining Agreement ("CBA") and applicable law. Those actions resulted in substantial emotional and financial harm to Sanchez for which he is entitled to relief.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Sanchez's claim for the Union's breach of its duty of fair representation arising under the Railway Labor Act, 45 U.S.C. § 151 *et seq*.  *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 76 (1991) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)); 29 U.S.C. § 185(a).  The Court has supplemental jurisdiction over Sanchez's remaining claims under 28 U.S.C. § 1367.

2.    Alternatively, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because Sanchez's claims are between persons and entities of different states and the amount in controversy exceeds $75,000 exclusive of interest, costs, and attorneys' fees.

3.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants do business in this District and Sanchez was employed by United in this District at the time of his termination.

4.    Sanchez brings this action under California Labor Code §§ 1101–1105 and § 98.6.[1]

---

[1] Sanchez has filed a charge of discrimination with the California Civil Rights Division alleging age and religious discrimination under the California Fair Employment and Housing Act and is awaiting the issuance of a Notice of Right to

## NATURE OF THE CASE

5.      This is a civil action arising from United's wrongful termination of Sanchez's employment in retaliation for Sanchez's lawful exercise of his right to speak and express his Union's failure to fulfill its duty of fair representation to Sanchez.  Specifically, United first investigated Sanchez because of a meritless online complaint about Sanchez's alleged statements to a colleague on a red-eye flight.  But when that investigation proved the allegations false, United then expanded the investigation to fourteen years' worth of Sanchez's posts ("the Posts") on the social media platform X (formerly known as Twitter).  Sanchez composed and published the Posts while he was off-duty and away from the workplace.

6.      In his Posts, Sanchez expressed his personal political views, opinions, and beliefs.  In retaliation for Sanchez's exercise of his speech rights, United terminated Sanchez's employment.

7.      Further, United treated Sanchez differently than his similarly situated younger co-workers and those who did not share Sanchez's religious beliefs.

8.      United's termination of Sanchez was in violation of the CBA as well as California law that prohibits religious, age, and political expression discrimination.

9.      The Union is contractually and legally bound to represent Sanchez during the grievance process.  Although it initially defended Sanchez, the Union abruptly dropped his representation, not because of any individualized assessment of his case, but for unreasonable and arbitrary reasons.

10.     Because Defendants took action that harmed him, in violation of their legal and contractual obligations, Sanchez is entitled to the relief sought herein.

---

Sue.  Once the Notice of Right to Sue has been issued, Sanchez will amend his complaint to formally add those claims to his Complaint.  Even so, the factual basis supporting those claims is included here.

## PARTIES

11.    Sanchez is a citizen and resident of the State of Alaska, Borough of Anchorage.

12.    Sanchez is a member of the U.S. military, and currently serves as a member of the Alaska Air National Guard 176th Wing.

13.    Sanchez was also a member of AFA-CWA and at all relevant times, was represented by AFA Council 42.

14.    Defendant United Airlines, Inc. is incorporated under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. Accordingly, United is a citizen of the States of Delaware and Illinois.  United operates a hub at Los Angeles International Airport ("LAX") and thus does business in Los Angeles County, California.  Sanchez was assigned to United's LAX hub at the time of his termination.

15.    Defendant Association of Flight Attendants–Communications Workers of America ("AFA-CWA") is a labor organization that maintains its principal office in Washington, DC.  Its duly authorized officers and agents represent or act for employee members across the nation.  *See* 29 U.S.C. § 185(c).

16.    Pursuant to the Railway Labor Act, the Union is the exclusive representative of United flight attendants, including Sanchez.  It has a duty to defend and represent flight attendants, including during grievance procedures.

17.    AFA has members at twenty different airlines.  Within each airline, the union has a Master Executive Council, made up of Local Executive Councils.  Each Local Executive Council President sits on the Master Executive Council as the voting member for the members of the Local Council he or she represents.  The Master Executive Council is responsible for coordinating the activities of AFA across an entire airline.

18.    Defendant AFA Council 42 is the AFA council to which United flight attendants belong who are based at George Bush Intercontinental Airport ("IAH")

or Austin-Bergstrom International Airport ("AUS").  AFA Council 42 is a labor organization that maintains its principal office in Houston, TX.  Its duly authorized officers and agents represent or act for employee members based in Texas at IAH or AUS.  AFA Council 42 represented Sanchez during the grievance process in 2023 and 2024 until the Union withdrew its representation and his grievance in October 2024 when Sanchez could not personally afford to pay the Union's portion of the arbitration fee.

19.     After AFA Council 42 handled the first 2 steps of the grievance process, the local counsel then forwarded the matter to the Master Executive Council (MEC) Grievance Chairperson, Maria Torre, who oversees all grievances that go to arbitration.  Ms. Torre oversees all the local council grievance committees for United flight attendants.

**FACTUAL ALLEGATIONS**

20.     Sanchez became a United flight attendant on January 7, 1996.

21.     On May 30, 2023, Sanchez worked United flight 1786, a red-eye flight from Los Angeles, CA to Cleveland, OH.  He had been assigned the flight at the last minute.  During the flight, in an effort to stay awake while most passengers slept, Sanchez had a private conversation with his fellow flight attendant.

22.     Sanchez and his colleague discussed their working conditions and everyday life.  As they were both Catholic, their discussion turned to Catholic theology and then, with United's "Pride Month" activities set to start on June 1, Catholic teachings on marriage and sexuality.

23.     On or about June 3, 2023, an individual going by the name "Danny Bottom" and using the X handle @papichicago, contacted United through United's X account to make a complaint about Sanchez.  According to the complaint, Bottom overheard Sanchez allegedly make comments on Flight 1786 indicating that Sanchez "openly hates black people and is anti-trans."

24.    Upon information and belief, "Danny Bottom" was not a passenger on Flight 1786.

25.    Bottom, who had previously harassed Sanchez on social media, also told United that Sanchez "was proud of his Twitter following" and provided United with Sanchez's X handle.

26.    United opened an investigation into Bottom's allegations and used the complaint as a pretext for scouring Sanchez's personal X account even though he had been on social media for over a decade, had several United employees who "followed" him, and there had been no prior complaints of his social media activity or, more importantly, his treatment of co-workers or customers.

27.    On June 10, 2023, Sanchez was placed on paid leave so United could investigate Bottom's complaint.  Indeed, all Sanchez was told was that he was to be on paid leave pending an investigation by corporate security.

28.    United scheduled a video call with Sanchez on June 16, 2023, to discuss the allegations.  Prior to that call, United had spoken with the three other flight attendants on Flight 1786 and all of them refuted Bottom's claims about Sanchez. That investigation was completed by June 14, 2023.

29.    United began the June 16, 2023 meeting by asking about Sanchez's conversation with his fellow flight attendant.  Sanchez denied making any racial comments.  When it came to the allegation that Sanchez was "anti-trans," Sanchez discussed his conversation with a co-worker during which they discussed church teachings on marriage being between a man and a woman and that a person is unable to change his/her sex.  Sanchez also noted that even though he is a gay male, he agrees with the church's teaching.  The in-flight conversation was in low voices in the galley away from all passengers and no passenger reported any issues.

30.    United's investigator, Jordan Rayburg, reacted negatively when Sanchez explained the religious basis for his beliefs.  Similarly, Sanchez's union

representative did nothing to support him when discussing his private conversation with his co-worker, who made no complaint of his interaction with Sanchez.

31.    United's CEO, Scott Kirby, has already come under scrutiny for his discrimination against employees of faith.[2]  A district judge found that United's policies "reflect[] an apathy, if not antipathy, for many of its employees' concerns and a dearth of toleration for those expressing diversity of thought."  *Sambrano v. United Airlines, Inc.*, 570 F. Supp. 3d 409, 420 (N.D. Tex. 2021), *rev'd and remanded on other grounds,* No. 21-11159, 2022 WL 486610, at \*3, \*9 (5th Cir. 2022) (agreeing that United's employees "are being subjected to ongoing coercion based on their religious beliefs").  A judge on the Fifth Circuit concluded that "[t]hrough both its policy and its official statements to employees, United has demonstrated a 'calloused approach to' and 'apparent disdain for' people of faith."  *Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 840 (5th Cir. 2021) (Ho, J., dissenting from denial of injunction pending appeal).

32.    Additionally, United has made it clear that it favors younger flight attendants, even announcing at "Backstage 2019," a training program held in Chicago, that United was going to focus on attracting millennial travelers and use flight attendants under 40 in its advertisements.

33.    Indeed, United has a history of targeting older flight attendants to terminate them for minor violations.  *See Stroup v. United Airlines*, 26 F.4th 1147, 1154 (10th Cir. 2022).

34.    Unable to terminate Sanchez based on Bottom's meritless and likely made-up complaint, United turned to Sanchez's social media account to manufacture a basis for his termination—due at least in part to United's objection to Sanchez's religious beliefs, age, and/or political expression.

---

[2] Airline Emps. for Health Freedom, *Putting Your Job On the Line*, YouTube (Dec. 3, 2021), https://tinyurl.com/49shwcje (remarks by United CEO Scott Kirby).

*United Investigates Sanchez Because of His Speech*

35.   Having come up empty with the original allegations, United expanded the investigation to Sanchez's X account.  Sanchez's supervisor told him that, because the original complaint referenced Sanchez's X account, Sanchez's entire X timeline was subject to scrutiny.

36.   Sanchez's timeline began in 2010 when he first opened a Twitter account.  United selected 35 of the 140,800 posts that Sanchez had at the time (a grand total of 0.02%) and accused Sanchez of lacking dignity, respect, professionalism, and responsibility on X when Sanchez was off-duty.  Yet, many of Sanchez's posts related to his political views (some of which are informed by his religious beliefs) and all of the posts were unrelated to his work for United.

37.   Further, many mid- and senior-level United management personnel had already been following Sanchez for years, and none of them had reported a problem with his posts going back to 2010.

*United's Social Media Policy*

38.   United's social media policy purports to cover "all social media" in which their employees "participate … while [they] are on or off the job, including social media [they] use without a name, under an alias or in private groups."[3]  Even so, the focus of the policy was on "the way people feel about flying us" and how an employee's social media "can positively impact the experience customers have with our brand."[4]

39.   As part of its policy, United encourages its employees to use social media, reminding them that "posting about your experiences on social media is the

---

[3] United Airlines, *Working Together Guidelines* 21 (Oct. 2023) (social media sec. dated Apr. 2023), available at https://tinyurl.com/bfu4e7za.

[4] *Id.*

COMPLAINT

best behind the scenes access we can offer" and assuring them that United is "proud when employees share their passion and camaraderie with their followers."[5]

40.    Indeed, as part of its investigation, United noted three such posts by Sanchez, but did not find any issues with those posts that reference United or Sanchez's work for the company.

41.    The policy also contains various guidelines, most of which had nothing to do with the posts United chose to highlight in its investigation.  Indeed, when properly read in context, to violate the policy, the posts, at very least, must have a direct impact on United's employees and/or customers.  Yet United offered no information to suggest Sanchez's off-duty, personal posts had any negative effect on his co-workers or a customer's experience with United.

42.    For example, United's Social Media policy requires[6]:

- All pictures, videos or other digital content in United uniform must comply with United appearance/uniform standards.

- All pictures, videos or other digital content taken in uniform or on United property/equipment should be professional.

- Social media posts should not negatively impact United's image or brand or violate Company policies.

- Social media posts directly or not directly related to United should not be suggestive or contain sexual content, which includes nudity or partial nudity.

  - Please remember: It is not acceptable to have a picture of you associated with United in one post and then another picture being sexually suggestive in another.

---

[5] *Id.*

[6] *Id.* at 21–23.

- Social media posts should not link United or its brand to violent or graphic photos or websites.
- Social media posts should not violate or depict violations of safety rules, Standard Operating Procedures or other Company policies, even if it's a joke or meme.
- Social media posts should be respectful and not violent, defamatory or bullying in nature to anyone.
- Social media posts, both public and private, should not be discriminatory, harassing or offensive to persons based on race, ethnic heritage, national origin, sex, sexual orientation, age, physical or mental illness or disability, marital status, religion, employment status, housing status, union activities/affiliation or other characteristics that may be protected by applicable civil rights or labor laws as determined by United.
- Employees may not use the United uniform, brand or their affiliation with United to make money outside of their employment…
- Employees may not speak on behalf of United without express authorization from the Company.  Be clear that your posts only reflect your views.
- Employees may not disclose United's confidential business information including changes to schedules, new product offerings or other confidential information on social media accounts.
- Employees may not post in a negative or derogatory manner about United's customers or other employees or violate their right to privacy.  Examples include:

11

> ▪ Complaining on social posts about a specific United customer or customers in general [or]
>
> ▪ Posting about a celebrity or other notable person being on a United flight or what they were like as a customer.

43. The policy further states:

> Generally, United does not actively monitor employees' personal social media accounts. However, there may be occasions where an employee's personal social media activity may be viewed by individuals at United and their identity determined if the post is without a name or under a false name. If United is made aware of content on social media involving an employee that potentially violates these standards, we have the right to investigate and take appropriate action. We will take into account many factors, including but not limited to the type of posting, audience, impact to the brand and our corporate reputation and any previous counseling or coaching. Appropriate action can be anything from asking you to remove a certain post in minor cases to termination in cases of significant misjudgment.[7]

### Sanchez's Posts

44. X, formerly known as Twitter, is a social networking platform. Sanchez has had an X or Twitter account since 2010. *See* Ruben D. Sanchez Jr (@rdsanchezjr), X, https://x.com/rdsanchezjr (last visited Jan. 14, 2024).

45. X allows its users to post content and see content posted by other users. X also allows its users to follow, and be followed by other users who post on X. Sanchez uses X to associate with and communicate with other X users, especially his followers and those he is following. X thus provides a vehicle for the exercise

---

[7] *Id.* at 23.

of several constitutionally protected freedoms, including the freedom of thought, the freedom of belief, the freedom of speech, and the freedom of association.

46.    Sanchez uses X, in part, to express his personal, religious, and political views, opinions, and beliefs.  Sanchez appreciates that X has never attempted to censor his speech, including the posts for which Defendants subjected Sanchez to discrimination and retaliation.  Sanchez knows that he is responsible for the content of his posts on X.

47.    United, however, has sought to exercise complete and unfettered control over Sanchez's X posts/speech through an overbroad reading of its social media and "Working Together" policies.  Such actions are in violation of state law as set out below and a strained and unreasonable interpretation of the rights granted to Sanchez under the CBA.  Further, the scope of social media policies such as United's have been found unlawful by the NLRB in circumstances analogous to the rights granted to Sanchez under the Railway Labor Act.

48.    Sanchez's X profile header prominently notes it is his "Personal Account" and lists his military affiliations but nothing about United.  *Id.*  At no time does he represent that he speaks on behalf of United.



49.     In an attempt to justify Sanchez's termination, United noted that a "review of your Twitter account found multiple posts promoting the Company which includes one of you in your flight attendant uniform."  Of course, that is precisely what United asks its employees to do in its social media policy.  Further, none of those posts were found to violate any United policy.

50.     United identified two posts where Sanchez reposted news articles about United.





COMPLAINT

51.     United also references a several months old humorous photo of Sanchez carrying a pilot over his shoulder, suggesting this created a "nexus" between his personal X account and his job at United.  At the same time, United offers nothing to suggest any issue with the post itself.



52.     United then accused Sanchez of racism because he chose to repost a post by former San Francisco Giants baseball player Aubrey Huff that itself contained a repost of a video showing a fight in a public place with a comment (not by Sanchez) about "worthless people" and no reference to race at all.  United also included ten replies to Mr. Huff's post, none by Sanchez.

53.     In another post, Sanchez expressed an opinion critical of Michelle Obama in a comment on someone else's post about her.  United again included comments to that original post from six other X users having nothing to do with Sanchez.

54.    At no time did Sanchez express or "endorse[] hostility towards the black community" as he was accused of by United.

55.    United then accused Sanchez of attacking the "transgender community."

56.    Sanchez has openly described himself as gay.  He reposted or liked other X users' criticisms of uniting the lesbian, gay, and bisexual movement with the transgender movement, expressing the political opinion that the transgender movement is distinct and does not further the "LGB" movement.



57.    United included several reposts from other gay men expressing the same opinion.

58.    Finally, United noted that Sanchez's account "contains content that reflects negatively on people of size."

59.    Sanchez did repost commentary about the obesity and overweight problem in the United States.  This issue is a hot political topic, with "[n]early three-quarters of U.S. adults [being] overweight or obese" and the nation's "growing

COMPLAINT

1    burden of weight-related diseases."[8]  It also figured prominently in the presidential

2    race, championed by Robert F. Kennedy, Jr., who has now been nominated for

3    secretary of the U.S. Department of Health and Human Services.[9]

4        60.    In one of his reposts, Sanchez makes it clear that calling out a weight

5    problem in the United States is not out of "hate" but to affect positive change out of

6    concern.

7
8
9
10
11
12
13
14
15



16        61.    Indeed, Sanchez reposted another user's post that specifically noted

17    how airlines, including United, treat "passengers of size" by requiring them to buy

18    an extra seat.  Sanchez used this as an example to demonstrate that simple criticism

19    or expressing disagreement is not "discrimination" in the negative connotation that

20    United suggests here.

21
22
23
24
25

26    [8] Nina Agrawal, *Three-Quarters of U.S. Adults Are Now Overweight or Obese*,
27    N.Y. Times (Nov. 14, 2024), https://tinyurl.com/3arsdu6z.

28    [9] Robert Pearl, *How RFK Jr. Could Reverse Our Nation's Illogical Approach To
Obesity*, Forbes (Dec. 9, 2024), https://tinyurl.com/4x3eucc6.

COMPLAINT

62.     United included several other posts in its initial investigation that are not referenced in its termination letter that simply show United was looking for any reason to terminate Sanchez.  Indeed, United's termination letter makes it clear that the original complaint by Bottom (on which Sanchez was exonerated) was not even considered when making the decision to terminate a nearly 28-year exemplary employee.  Rather, United relies exclusively on personal social media posts that have nothing to do with Sanchez's job performance as required by the CBA to justify his termination.

63.     Sanchez's suspension was supposed to only last 30 days, but it was extended due to his mandatory military service leave.

64.     When he returned to United in November 2023, Sanchez was reassigned to United's LAX hub.  He remained on paid leave and was not permitted to fly.

65.     On January 8, 2024, United met with Sanchez to terminate him for his religious and political beliefs, all in violation of the CBA and applicable law that prohibits such retaliation and discrimination.  This was confirmed by letter dated January 10, 2024.

66.     United's decisions, including its targeting of Sanchez throughout the investigation, and its ultimate decision to terminate him, were made with the

knowledge and approval of those who qualified as "an officer, director, or managing agent" of United.  Cal. Civ. Code § 3294(b).

### *The Unions Drop Their Representation of Sanchez*

67.    United's flight attendants are represented by the AFA-CWA.  The current union agreement is the 2016–2021 Flight Attendant Agreement ("CBA").[10]  The parties have been unable to reach an understanding on a new agreement.

68.    Under the CBA, "A Flight Attendant who has passed the probationary period shall not be disciplined or discharged without just cause."  CBA Sec. 23.A.8 (p. 194).

69.    Additionally, "The Company and Union recognize the value of a diverse Flight Attendant workforce and share a mutual commitment to a workplace free of discrimination in which it is unacceptable to engage in offensive behavior based on protected categories.  The Company shall not discriminate with regard to terms and conditions of employment based on age, … religion, … or any other protected category under applicable law."  CBA Sec. 3.S (p. 19).

70.    Per the terms of the Collective Bargaining Agreement, Sanchez is entitled to union representation if United conducts an investigation that may lead to disciplinary action or discharge.  CBA Sec. 23.A.1 & 2 (p. 193).

71.    Before any investigation, a flight attendant "shall be notified in writing of the precise charge or charges being investigated[.]"  CBA Sec. 23.A.2 (p. 193).

72.    A flight attendant who is disciplined or discharged has thirty days to file a grievance to dispute that decision.  CBA Sec. 23.A.9 (p. 194).  The grievance process provides for escalating procedures to resolve the issue, culminating in a proceeding before the System Board of Adjustment.  CBA Sec. 23.B–D (pp. 194–98), Sec. 24 (pp. 206–07).

---

[10] United Airlines, Inc. & Assoc. of Flight Attendants-CWA, 2016–2021 Flight Attendant Agreement (Aug. 28, 2016), available at https://cdn.afacwa.org/docs/cba/united/united-2016-2021.pdf.

73.     During the initial meeting on June 16, 2023, the Union did nothing to defend Sanchez.

74.     The Union initially defended Sanchez through Steps 1 and 2 of the Grievance procedure.  During the Step 2 process, the union representative told Sanchez that he "didn't say anything bad."  She noted that Sanchez was entitled to his opinion, that he was not talking about any employee or customer, and that United was just overreacting.  The Union then abruptly changed course, dropping his representation when it came to arbitration.

75.     The Union told Sanchez it would wait to determine if it would represent him in arbitration as it wanted to wait for the results of another arbitration, the facts of which were never shared with Sanchez other than that it involved social media. At no point did the Union provide Sanchez with any evaluation of his claims or suggest that an individualized assessment of Sanchez's case factored into its decision.

76.     As the Supreme Court has held, "[i]n administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances." *Vaca*, 386 U.S. at 194.  The Union failed to abide by this long-standing requirement in Sanchez's case.

77.     The Union's decision not to pursue arbitration on behalf of Sanchez was arbitrary and in bad faith.  Indeed, the Union had a solid basis to challenge United's social media policy on a facial basis under an August 2023 National Labor Relations Board decision, which provides clear analysis of why United's policies and actions violated Sanchez's rights. *Stericycle, Inc. & Teamsters Loc. 628*, 372 N.L.R.B. No. 113 (2023), slip op. at 1 (finding policy that a reasonable, economically dependent employee may find to preclude "statutorily protected activities" was facially unlawful, similar to several of the provisions in United's social media policy).  Further, the fact none of the X posts United relied on to

terminate Sanchez had anything to do with United, or Sanchez's work on behalf of United, provides solid evidence that Sanchez's termination was in violation of the CBA. Indeed, the union representative noted as much during the Step 2 process. Lastly, United's negative reaction to Sanchez's religious beliefs during the June 16, 2023 meeting and United's history of discrimination against employees of faith, more than justified taking Sanchez's claims to arbitration.

78.    In August 2024, the Union told Sanchez that if he raised the Union's half of the arbitration costs and hired his own attorney, he could continue with the arbitration, but the Union would not represent him.

79.    Sanchez attempted to raise money to fund his arbitration, but he did not raise enough in time. Accordingly, on October 17, 2024, the Union told Sanchez that his arbitration was cancelled, and his grievance withdrawn.

80.    This is not the first time the AFA-CWA has failed to support religiously observant employees.

81.    In 2022, two Alaska Airlines flight attendants sued AFA-CWA after the flight attendants questioned Alaska Airlines' support for the 2021 Equality Act, a proposal that would have added LGBTQ protections to federal civil-rights law. *See Brown v. Alaska Airlines, Inc.*, No. 2:22-cv-668-BJR, 2024 WL 2325058, at *24 (W.D. Wash. May 22, 2024), *appeal docketed,* No. 24-3789 (9th Cir. June 18, 2024).

82.    The Alaska Airlines workers' suit alleged the AFA-CWA Master Executive Council did not support the employees but instead reported their comments to company officials.[11]  *Id.* at *23.

---

[11] Jon Brown, *Union Boss Reported Flight Attendants Fired for Opposing the Equality Act, Court Filing Says*, Christian Post (Jan. 19, 2024), https://tinyurl.com/yfnbayyz.

COMPLAINT

***United's Treatment of Sanchez's Co-Workers***

83.    Sanchez respects the rights of his co-workers to express their views on social media, even if they differ from his own, and he remains personally fond of his many friends at United and the Union.

84.    United's termination of Sanchez is disproportionate to how United treated other United employees who posted non-work-related matters on social media.

*Incident #1*

85.    For example, an author for the popular online travel blog, *The Points Guy*, assigned to review United's flights, wrote a Twitter thread about his difficulties getting an alcoholic beverage from a United flight attendant.[12]

86.    A United flight attendant then responded to that thread.  Her social media cover photo depicted her in a United flight attendant uniform posing in a United cockpit, along with other photos of her at work.[13]

87.    The flight attendant told the reviewer that "[f]ood service is just a perk … they are trained safety professionals to evacuate customers in a burning crash…even the drunks! [laughing emojis]."  She then told the reviewer, "[a]lways the drunks causing the issues.  Free alcoholic…they drink like camels."[14]

88.    When the reviewer contacted United, a spokesperson responded that "This is a flight attendant's personal Twitter account.  However, our expectation is that our flight attendants will treat our customers with respect whether that is inflight or online. We are reviewing the other concerns expressed."[15]

---

[12] *The Problem With United FAs. Even I'm Fuming At This!*, Arliners.net: Civ. Aviation F., https://www.airliners.net/forum/viewtopic.php?f=3&t=1396871 (archive of Twitter thread).

[13] *Id.* (post of @Gianna1809 (Oct. 25, 2017)).

[14] *Id.* (posts of @Gianna1809).

[15] Zach Honig, *A Flight Attendant Attacked Me on Twitter. Drama Ensued.*, The Points Guy (June 20, 2018), https://tinyurl.com/2tvcu3v7.

89.    Sanchez believes that discovery will reveal that United treated the investigation and punishment in this case differently than it did for Sanchez.

*Incident #2*

90.    Another incident a little over one year ago, a United pilot, Ibrahim Mossallam, wrote a Facebook post praising the Hamas October 7th terrorist attacks, referring to their actions as "brave."  He also wrote that "the mass media is manipulated in a political and biased way to show a non-conquering narrative of Palestine," and that Hamas's terror attacks were not "without provocation from the other side."[16]

91.    Mossallam was suspended with pay during an investigation but, upon information and belief, was back flying for United after being suspended for a month.

92.    His biography as the Board Vice-President of the Council of American-Islamic Relations in New York still describes him as "a professional international airline pilot."[17]

93.    Sanchez believes that discovery will reveal that United treated the investigation and punishment in this case differently than it did for Sanchez.

*Incident #3*

94.    Another United flight attendant, Alexa Wawrzenski created a social media account featuring pictures of herself in uniform and wearing a bikini, with a link to her OnlyFans account, where she promised "[e]xclusive private content you won't see anywh[ere else]."[18]

---

[16] *United Airlines Suspends Pilot After Praising Hamas's October 7 Attacks*, Jerusalem Post (Nov. 25, 2023), https://www.jpost.com/israel-news/article-774560.

[17] *Ibrahim R. Mossallam*, CAIR NY, https://www.cair-ny.org/ibrahim-headshot-bio (last visited Jan. 15, 2024).

[18] Mia Taylor, *Former United Airlines Attendant Allowed to Proceed With Gender Discrimination Case*, MSN, https://tinyurl.com/ym3nhvwt (last visited Jan. 15, 2024.

95.     Upon information and belief, and as alleged by Wawrzenski, male United employees with similar accounts are treated differently.  Those accounts feature pictures of themselves in uniform and partially undressed.[19]

96.     Unlike Sanchez, Wawrzenski was first given the opportunity to delete all photos of herself in uniform from her social media account in order to resolve the matter.  She did so, but United claimed she missed one where a heavily filtered photo still showed the faint outline of her uniform.  United then fired her.[20]

97.     Sanchez believes that discovery will reveal many more examples of United treating employees who allegedly engaged in the same conduct as Sanchez differently, thus establishing a breach of the CBA in his case as well as discrimination on the basis of religion and age.

### FIRST CLAIM FOR RELIEF:

### WRONGFUL DISCHARGE

### California Labor Code § 1101 *et seq.*

### *Against United Airlines*

98.     Sanchez re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

99.     Section 1101 of the California Labor Code provides:

No employer shall make, adopt, or enforce any rule, regulation, or policy:

(a) Forbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office.

(b) Controlling or directing, or tending to control or direct the political activities or affiliations of employees.

Cal. Lab. Code § 1101.

---

[19] *See id.*

[20] *Id.*

100. In violation of Section 1101(a) of the California Labor Code, United terminated Sanchez's employment based on his social media posts, thereby unlawfully forbidding or preventing Sanchez from engaging or participating in politics.

101. In violation of Section 1101(b) of the California Labor Code, United terminated Sanchez's employment based on his social media posts, thereby unlawfully controlling, directing, or tending to control or direct Sanchez's political activities or affiliations.

102. Section 1102 of the California Labor Code provides:

> No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

103. In violation of Section 1102 of the California Labor Code, United coerced, influenced, or attempted to coerce and influence Sanchez because of his social media posts by means of a threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity; and United actually carried out that threat of discharge or loss of employment.

104. The termination of Sanchez's employment was substantially motivated by United's disagreement with Sanchez's political beliefs and its actions caused Sanchez harm.

105. United's attempt to curtail Sanchez's political expression outside of the workplace and control his political expression standing alone implies an employer policy in violation of Sections 1101 & 1102 of the California Labor Code. *See Smedley v. Capps, Staples, Ward, Hastings & Dodson*, 820 F.Supp. 1227, 1230 (N.D. Cal. 1993) ("Similarly, if plaintiff had been instructed to curtail her gay-

oriented political activities outside the office, this would constitute a violation of § 1101."); *Ross v. Indep. Living Res. of Contra Costa Cnty.*, No. C08-00854 TEH, 2010 WL 1266497, at *6 (N.D. Cal. Apr. 1, 2010) ("The allegation that Ross was terminated as a result of his political activity is sufficient to plausibly suggest the existence of such a policy.").

106.    The termination of Sanchez's employment served as an implicit warning and message to United's other employees that the expression of views departing from liberal perspectives on race, political figures, the transgender movement, and public health issues would not be tolerated. *See Napear v. Bonneville Int'l Corp.*, No. 2:21-CV-01956-DAD-DB, 2023 WL 4747623, at *10 (E.D. Cal. July 25, 2023) (holding such implicit messages constituted an employer policy under Sections 1101 & 1102).

107.    United's actions were done with the knowledge, approval and even at the direction of individuals who served as "officer[s], director[s], or managing agent[s]" of each Defendant.  Cal. Civ. Code § 3294(b).

108.    Section 1105 of the California Labor Code provides:

> Nothing in this chapter shall prevent the injured employee from recovering damages from his employer for injury suffered through a violation of this chapter.

109.    These Sections provide employees with a private right of action against employers. *See* Cal. Lab. Code § 1105 (providing for the availability of money damages); *Gay L. Students Ass'n v. Pac. Tel. & Tel. Co.*, 595 P.2d 592, 611 (Cal. 1979) ("Thus, since the allegations of the complaint do allege that PT&T has engaged in conduct which violates these statutory provisions, the complaint also states a cause of action against PT&T on this ground."); *Ross*, 2010 WL 1266497, at *5 ("It is not necessary for [Plaintiff] to plead the elements of breach of contract in order to bring a section 1101 claim.").

110. United's actions damaged Sanchez in the loss of his employment with United.

111. United's actions further damaged Sanchez by causing him lost future employment opportunities in the commercial airlines industry.

112. Sanchez has suffered emotional distress because of United's actions.

113. United's harassment and termination of Sanchez were (1) intended to cause injury to Sanchez; (2) amounted to despicable conduct undertaken with willful and conscious disregard of Sanchez's rights under California law; and (3) amounted to despicable conduct that subjected Sanchez to cruel and unjust hardship in conscious disregard of his rights, thus supporting punitive damages.

## SECOND CLAIM FOR RELIEF:

## WRONGFUL DISCHARGE AND REFUSAL TO HIRE

### California Labor Code § 98.6

#### *Against United Airlines*

114. Sanchez re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

115. Section 98.6 of the California Labor Code provides in pertinent part:

(a) A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, … or because of the exercise by the employee or applicant for employment on behalf of themselves or others of any rights afforded them.

(b)(1) Any employee who is discharged, threatened with discharge, demoted, suspended, retaliated against, subjected to

COMPLAINT

an adverse action, or in any other manner discriminated against in the terms and conditions of their employment because the employee engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, … shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer.

116.    In violation of Section 1101(a) of the California Labor Code, United terminated Sanchez's employment based on his social media posts, thereby unlawfully forbidding or preventing Sanchez from engaging or participating in politics.

117.    In violation of Section 1101(b) of the California Labor Code, United terminated Sanchez's employment based on his social media posts, thereby unlawfully controlling, directing, or tending to control or direct Sanchez's political activities or affiliations.

118.    In violation of Section 1102 of the California Labor Code, United coerced, influenced, or attempted to coerce and influence Sanchez because of his social media posts by means of a threat of discharge or loss of employment. United's threats and harassment were undertaken in an effort to force Sanchez to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity; and United actually carried out that threat of discharge or loss of employment.

119.    The termination of Sanchez's employment was done with the knowledge, approval and even at the direction of individuals who served as "officer[s], director[s], or managing agent[s]" of United. Cal. Civ. Code § 3294.

120.    Based on those violations, United also violated Section 98.6(a) of the California Labor Code by retaliating against Sanchez for conduct protected by Sections 1101 & 1102 of the California Labor Code.

121.    United's actions damaged Sanchez in the loss of his employment with United.

122.    United's actions further damaged Sanchez by causing him lost future employment opportunities in the commercial airlines industry.

123.    Sanchez has suffered emotional distress because of United's actions.

124.    United's harassment and termination of Sanchez were (1) intended to cause injury to Sanchez; (2) amounted to despicable conduct undertaken with willful and conscious disregard of Sanchez's rights under California law; and (3) amounted to despicable conduct that subjected Sanchez to cruel and unjust hardship in conscious disregard of his rights, thus supporting punitive damages.

**THIRD CLAIM FOR RELIEF:**

**BREACH OF CONTRACT**

***Against United Airlines***

125.    Sanchez re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

126.    The CBA provides that United "shall not discriminate with regard to terms and conditions of employment based on age, … religion, … or any other protected category under applicable law." CBA Sec. 3.S (p. 19).

127.    The CBA also provides that Sanchez may not be terminated except for "just cause." CBA Sec.23.A.8 (p. 194).

128.    United treated Sanchez differently based on his age and religion, and political beliefs, which are all protected categories under applicable law.

129.    Additionally, Sanchez was terminated without just cause. United's reliance on Sanchez's non-work-related posts was simply a pretext for his termination as none of the posts concerned or affected his co-workers or United's

29

customers. *See* CBA Sec. 23.D.1 (p. 197) (requiring that "action is justified by legitimate business reasons"). This was done by overstating the "gravity of the offense" and without any consideration to Sanchez's "seniority, and work record" that showed no prior related discipline. CBA Sec. 23.D.5 (p. 197).

130. United's termination of Sanchez was contrary to United's Social Media policy, Working Together Expectations, Promoting Dignity and Respect: Harassment and Discrimination policy, and Protection Against Retaliation policy.[21]

131. Sanchez was interrogated and investigated for his social media posts because of his age, religion, and political beliefs, while his co-workers who were younger or held different religious and political beliefs were not similarly.

132. Sanchez has suffered compensatory damages because of United's actions. Sanchez should be reinstated with full backpay, benefits, and seniority.

**FOURTH CLAIM FOR RELIEF:**

**BREACH OF DUTY OF FAIR REPRESENTATION**

***Against AFA-CWA***

133. Sanchez re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

134. A union breaches its duty of fair representation if its conduct toward a member is "arbitrary, discriminatory, or in bad faith." *See Vaca,* 386 U.S. at 190; *see also Beck v. United Food & Com. Workers Union, Loc. 99,* 506 F.3d 874, 879 (9th Cir. 2007).

135. The union's duty extends to the investigation and representation of a grievance. *See Evangelista v. Inlandboatmen's Union of Pac.,* 777 F.2d 1390, 1395 (9th Cir. 1985) ("A union's duty of fair representation includes the duty to perform some minimal investigation, the thoroughness of which varies with the circumstances of the particular case." (citations omitted)). A union must exercise

---

[21] *See supra*, note 3.

special care in the discharge context because discharges are the most serious sanction an employer can impose. *Tenorio v. N.L.R.B.,* 680 F.2d 598, 602 (9th Cir. 1982).

136.    The Union explained it abandoned its duty to fairly represent Sanchez based on the Union's lack of success with other social media cases which were based on facts and circumstances fundamentally different from those involved here. At no time did the Union base its decision on an individualized assessment of Sanchez's claims.

137.    The Union's failure to individually evaluate Sanchez's case and its decision to abandon his representation on the grounds discussed above was arbitrary, discriminatory, and in bad faith.

138.    Sanchez was ultimately terminated because the Union abandoned his representation.

139.    Sanchez has suffered compensatory damages, emotional distress, and out-of-pocket costs due to the Union's actions.

## PRAYER FOR RELIEF

WHEREFORE, Sanchez prays for relief as follows:

1.    Preliminary and permanent injunctive relief requiring United to reinstate Sanchez to his prior position with no loss of pay or benefits;

2.    A judgment declaring that United's termination of Sanchez's employment violated the Collective Bargaining Agreement and/or was unlawful and in violation of California law;

3.    A judgment declaring that the Union failed in its duty of fair representation by failing to take Sanchez's grievance to arbitration;

4.    Compensatory damages, including but not limited to loss of pay and benefits from the date of termination to the date of reinstatement, in an amount to be determined at trial, but exceeding $75,000;

5.    Compensatory damages for loss of future employment in an amount to be determined at trial;

6.    Emotional distress damages, in an amount to be determined at trial;

7.    Punitive damages, in an amount to be determined at trial;

8.    Reasonable attorneys' fees and costs; and

9.    Such other and further relief as the Court may deem just and proper.

10.    Sanchez demands a trial by jury.

Respectfully submitted,

*/s/ Donald M. Falk*
Donald M. Falk (SBN 150256)
dfalk@schaerr-jaffe.com
SCHAERR | JAFFE LLP
Four Embarcadero Center
Suite 1400
San Francisco, CA 94111
Tel.: (415) 562-4942
Fax: (202) 776-0136

Eugene Volokh (SBN 194464)
evolokh@schaerr-jaffe.com
SCHAERR | JAFFE LLP
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Tel.: (310) 206-3926

32

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gene C. Schaerr*
gschaerr@schaerr-jaffe.com
Edward H. Trent*
etrent@schaerr-jaffe.com
Brian J. Field*
bfield@schaerr-jaffe.com
Justin A. Miller*
jmiller@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Tel.: (202) 787-1060

*Pro hac vice application
forthcoming

*Counsel for Plaintiff*

Dated: January 17, 2025

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in this case.

Dated: January 17, 2025

/s/ Donald M. Falk
Donald M. Falk (SBN 150256)
dfalk@schaerr-jaffe.com
SCHAERR | JAFFE LLP
Four Embarcadero Center
Suite 1400
San Francisco, CA 94111
Tel.: (415) 562-4942
Fax: (202) 776-0136

Eugene Volokh (SBN 194464)
evolokh@schaerr-jaffe.com
SCHAERR | JAFFE LLP
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Tel.: (310) 206-3926

Gene C. Schaerr*
gschaerr@schaerr-jaffe.com
Edward H. Trent*
etrent@schaerr-jaffe.com
Brian J. Field*
bfield@schaerr-jaffe.com
Justin A. Miller*
jmiller@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Tel.: (202) 787-1060

*Pro hac vice application
forthcoming

Counsel for Plaintiff

34

COMPLAINT